## RULAND v. BOHNER.

No. 18853. Opinion Filed May 5, 1931.

C. T. O'Neal and Arch M. Parmenter, for plaintiff in error.

J. M. Williams and Stevens & Cline, for defendant in error.

SWINDALL, J. The parties will be referred to as they appeared in the trial court.

The petition set up the following contract:

"Exhibit A.

"Contract for Deed.

"This agreement made and entered into this the 29th day of August, 1925, by and between Wreatha J. Ruland, party of the first part, and India T. Bohner, party of the second part.

"Whereas said party of the first part has this day agreed to and with said party of the second part to sell and convey by good and sufficient warranty deed the following real estate, to wit:

"All of lot sixteen (16), block fifty-two (52) Original Town of Lawton, Okla. For the consideration of thirty-one hundred dollars ($3,100.00), to be paid as follows: Five hundred dollars, the receipt of which is hereby acknowledged, to be placed in the American National Bank for a period of time not to exceed thirty days, in which abstract of title is to be brought down to date by party of the first part, and party of the second part allowed to have attorney examine and pass on same, then if abstract of title is satisfactory party of the second part to assume a loan of six hundred dollars ($600.00) now against above described real estate, and to pay two thousand dollars ($2,000.00) making a total consideration of thirty-one hundred dollars.

"It is further understood that party of the first part is to pay all tax due against property for year of 1924. And that party of second part is to receive all rents from the date of the closing of this contract.

"Witnesses:
"Georgia Glass      Wreatha J. Ruland
"A. L. Carlton"       India Bohner."

And it further alleged performance by plaintiff and breach by defendant, alleged and renewed a tender, and prayed for specific performance of the contract. The defendant answered by general denial, and further pleaded that the plaintiff's title was not merchantable because she had procured her conveyance by "false and fraudulent representations, statements and promises," and that defendant had been informed of the defective title by various persons. The defendant further sought damages by way of cross-petition.

The execution of the agreement by both parties on August 29, 1925, was not denied. On August 31st, the plaintiff executed the deed to the defendant and procured an abstract certified to that date, which was turned over to Mr. Williams, the attorney designated by the defendant, her brother-in-law, who approved the title without qualification by opinion dated September 2, 1925. The defendant testified that right after getting the title opinion of Mr. Williams she went to the premises with a contractor and stopped at the house of Mrs. Wallace, who asked her what she was doing, and that in answer to defendant's statement that she had bought the premises Mrs. Wallace said that she could not get good title, since her son had tried to purchase the property a few years before and the plaintiff had told him that she could not sell it during the lifetime of her mother. She further testified that Mr. Wallace, the son, came out during the conversation and confirmed his mother's statement. The defendant also testified that after that she waited about five days and went to Oklahoma City, where she saw the plaintiff, who apparently left for her work and left the defendant with her mother without objection. She said that after the plaintiff had left she asked Mrs. Burns, the plaintiff's mother, about "this property that I had bought"; that Mrs. Burns began to cry and said:

" 'Mrs. Bohner, I wasn't to sell this place as long as I lived; it was to keep me.' I said, 'Then what did you do it for to Mrs. Ruland?' And she said, 'I had to,' and then she began crying and telling me some other things in regard to her property, and I said, 'Mrs. Burns, do you know anything about the will?' And she said, 'My husband left a will and after he died my children didn't like it and tore it up,' and I said to her, 'Was that in regard to this piece of property?' And she said, 'I wasn't to will any of my property until after I died.' "

She testified that Mrs. Burns was nervous, was a little bit of a body, with her face shrunken, and that she lived in the past instead of the future, and that she was beautiful to look at.

It is not denied that after getting the opinion of Mr. Williams the defendant asked leave of Mr. Carlton, the broker, to take the abstract to a Mr. McMahon, and it does not appear that he made any objections to the title. Neither does it appear that it was within the five days after the conversation with the Wallaces or after defendant's return from Oklahoma City. The defendant testified that on her return home she wrote the plaintiff telling her what her mother had said. It appears, however, that before writing she took the abstract to Mr. Stevens, who passed it as a merchantable title of record, but said that he had advised that she get quitclaim deeds from the parties, and asked Mr. Carlton if he would get them, and Mr. Carlton said that he would gladly get them, and that he wrote to the plaintiff and got them within a few days. This appears to have taken place September 24, 1925, as Mr. Carlton forwarded the deeds that day and the defendant on that date posted the following letter:

"Mrs. India Turner Bohner
"619 E. Street
"Lawton, Oklahoma

"Dear Mrs. Ruland:

"The loan I am going to get the money from would like to get a quitclaim deed from your mother also your brothers as your mother was quite old at the time she made the deed to you, and as there is quite a bit of oil stir would like to have it at once if possible.

"Very respectfully,
"India Bohner."

"P. S. Let me know at once when I can expect them."

The plaintiff made immediate arrangements to get the deeds and wrote defendant a letter dated September 26th, posted September 28, 1925, stating that she would attend to the matter at once and send the deeds to Mr. Carlton. Two of the deeds were executed September 30, 1925, which was after the 30-day period provided in the contract, and they were at once mailed to Mr. Carlton. The deed of one brother having been signed by initials, a new deed was drafted and was executed by him October 5, 1925, and was received by Mr. Carlton a few days after the receipt of the deeds of the mother and the other brother. Plaintiff and her two brothers were all of the heirs of the mother. The defendant claims that she was very anxious to go on with the deal, and would have made the trade if the deeds had been received within the 30 days. She testified that two of the deeds were received within the 30 days, in which she was in error. It is very clear that she regarded the contract as in effect after the 30-day period, because, after practically admitting that she did not receive the proceeds of a loan on her farm property until late in October or afterwards, she continued in denying that she breached the contract because of a desire to purchase other land, and claimed that after the proceeds of the loan were received she kept the money on hand for some time to see if the deeds would be procured. Mr. Carlton testified that he went out and showed the deeds to the defendant, but the

defendant denied that, and claimed that he told her that he would deposit them in the bank and that she went to the bank and they were not there. Mr. Carlton also testified that he informed Mr. Stevens of the arrival of the deeds, and Mr. Stevens did not take the stand in denial, but after it had appeared that he had required the deeds, he argumentatively asked Mr. Carlton if he did not know that he, Mr. Stevens, was not to have anything to do with closing the transaction. On November 28, 1925, the defendant wrote the plaintiff the following letter:

"Mrs. India Turner Bohner
"619 E. Street
"Lawton, Oklahoma, Nov. 28, 1925

"Mrs. Ruland:

"The contract I signed was to have been a perfect title but I find there is a cloud hanging over the property. Therefore I want my check back immediately. My lawyer tells me I don't have to receive property where there is a cloud hanging over it. I want this brought to a close at once.
"Very respectfully,
"India Bohner."

On December 3rd defendant again wrote the plaintiff, as follows:

"Mrs. India Turner Bohner
"619 E. Street
"Lawton, Oklahoma.    Dec. 3-25

"Dear Mrs. Ruland:

"I have been informed your mother's husband left a will in which this property could not be sold until after her death but the will was destroyed. My attorneys tell me therefore this is a cloud on the property. Please state in your letter for the bank to return the check.
"Very respectfully,
"India Bohner."

Sometime during the next month or two the plaintiff went to Lawton and with Mr. Carlton went to the defendant's home in an endeavor to get the transaction closed. There is a sharp dispute as to what transpired at that time. The defendant states that she told plaintiff that her mother had told defendant that the father left a will and that plaintiff replied that nothing her mother could say would be taken in court; she further said that she asked the plaintiff why it was that if she could not sell to Mr. Wallace she was trying to sell to her, and that the plaintiff replied that "property is going down and we need the money and have decided to sell." Mrs. Hall and Mrs. Tedford, who roomed with the defendant, were present. Mrs. Hall was not called as a witness. Mrs. Tedford, during the conversation, was in an adjoining room. She testified that the defendant said to the plaintiff, "Your mother told me that you couldn't sell this in her lifetime," and the plaintiff replied that the court would not take anything her mother would say. She also testified that the matter of a will was discussed. She stated that she was not listening purposely, but that she knew about the transaction and that was how she came to remember. She could not remember anything else that was said during the conversation. Mr. Carlton stated that he was present at that conversation and that the matter of the title was discussed, but neither party asked him about the details of the conversation. It appears from the plaintiff's evidence that her mother died December 4, 1926, at the age of 89, so that when she deeded to plaintiff November 20, 1918, she was about 81, and when she executed the quitclaim deed in September, 1925, she was in the neighborhood of 88 years old. Mrs. Wallace was not called, but her son was, and after testifying that the plaintiff told him she could not sell the property during the lifetime of her mother, then admitted that she might have said she "would not" sell, and admitted that his memory was indistinct because the conversation had been had five or six years before that and maybe longer. The plaintiff testified that her father did leave a will and that in this conversation at the defendant's home she explained that matter. She said that at the time this propery was conveyed to her mother conveyed all her property to her children, and she also testified that the division had been agreed on for over a year before that; and that this property had been purchased by the mother from the proceeds of property inherited from the mother's father. She said that at that time the defendant did not ask her about the Wallace matter, and that her conversation with defendant about that took place before the contract of sale was executed. She further testified that in the conversation about the mother's condition and acceptance of her testimony in court, that matter was brought up by Mrs. Bohner herself in that conversation at her home in Lawton, and that she told defendant positively that there was nothing wrong with her mother's mental condition, but that she was not in a physical condition to be put on the witness stand, and she denied stating that the testimony of her mother would not be received in court. The plaintiff was corroborated by Emma J. Thompson in her statement that the matter of the Wallace conversation was known to defendant before the contract was executed, and in other respects. Mrs. Thompson testified

that the trade was made along about August or September and that the defendant had been at her house and they had talked about the property, and that she thought it was on this visit that defendant asked her if she had heard anything about the title; that she told defendant what she thought about the title, and that at a later time the defendant came to her place and in a visit on the porch told her that she had bought the property and told her how she expected to fix it up. She further testified that some time after that the defendant told her she had deeds from all of the heirs, to which the witness replied that she did not see what she would want better than that. Mrs. Thompson also testified that later, she was quite sure it was prior to the following July, the defendant told her she had not taken the property "because she knew a farm out here and they were going to drill an oil well and that it would pay her better to buy that and she wasn't going to take the property." Mrs. Thompson also testified that before she ever knew the defendant talked about buying it she went and looked at the property, in fact, went several times, and had a carpenter make an estimate on repairs; that she did not investigate the title, but talked with the plaintiff's mother once about the property and found nothing wrong with the title. There was another sharp controversy in the testimony between Mr. Carlton and the defendant. Mr. Carlton testified that as late as the middle of October she stated as a reason for not performing that she had not obtained her loan. The defendant testified that she had arranged with the banker to loan her the money temporarily if her loan should not be closed within 30 days. The banker did not recall the transaction, but said that defendant's credit was good and she might have asked for the loan and he would not remember it, as he would not have especially charged his memory with it.

The court, in compliance with the request of the plaintiff made upon the trial, made special findings and conclusions, in which it found that the contract was executed, the deed and contract with the $500 check deposited promptly in the bank, and that the abstract was promptly furnished to the defendant's attorney, who promptly approved the title. The court, however, after finding that the attorney had approved the title, made four findings which, summarized, were as follows: (3rd) That in the meantime defendant was informed by Mr. Wallace that plaintiff had told him she could not sell her property until after the mother's death. (4th) That defendant carried this information to her local attorney, who advised her

to secure quitclaim deeds from the mother and her heirs. (5th) That the requirement was made and was complied with within a reasonable time to the extent of securing the deeds, but that they were not delivered to defendant or either of her attorneys, though plaintiff informed defendant that they had been secured and were ready to deliver. (6th) That in the meantime defendant had gone to Oklahoma City, where she saw the plaintiff and her mother and talked to them; that the talk with Mrs. Burns was not very satisfactory to the defendant, who was somewhat doubtful about her mental condition, and that later when plaintiff and Mr. Carlton called on the defendant and advised her that they had the quitclaim deeds and were ready to close the transaction, the defendant advised the plaintiff of the conversation had with Mrs. Burns, upon which plaintiff said that the testimony of Mrs. Burns would not be received in court, implying that her mental condition was such as to make her an incompetent witness. The court, in addition to these findings, found that defendant refused to complete the transaction and that the deed to plaintiff from her mother recited that it was for $1 and other valuable considerations.

The court then concluded that there was a reasonable doubt as to the validity of the title of the plaintiff, saying that her statement to Mr. Wallace was against interest and entitled to weight and that if the title had been accepted in disregard of that information and Mrs. Burns had brought suit claiming an agreement to support her and that the property was not to be conveyed during her lifetime, there would be no defense, or if after the quitclaim deeds had been obtained a guardian had been appointed and should sue to set aside the deed to the plaintiff and from her to the defendant, how could she defend? That if Mrs. Burns was incompetent, of what value was her deed? The court concluded that those dangers seemed to raise a reasonable doubt, and that having reached that conclusion, it was not necessary to decide whether the agreement was unilateral.

The court, however, followed in the same sentence and held that the agreement, considering the conduct of the parties under it, was a contract to buy and sell according to its terms.

The defendant excepted to the finding that the agreement was one of purchase.

Plaintiff excepted to findings Nos. 3, 4, 5, and 6, and to the conclusion that the title was reasonably doubtful, and complains on

those grounds and on the grounds that the findings, conclusions, and judgment were contrary to law and against the clear weight of the evidence.

(1) The defendant contends that the agreement was a mere option. In none of the cases cited by defendant was the alleged vendee obligated by any promise, express or implied. Only one seemed at all similar (Indiana & Arkansas Lumber & Manufacturing Co. v. Pharr et al. [Ark.] 102 S. W. 686), and there the agreement was executed only by the alleged vendor, and the court could not conclude from the agreement that the defendant was obligated even though the title was satisfactory. The present case is radically different. Here the contract was not only signed by both parties, but after providing that the abstract should be furnished and should be examined, it further provided that if the title was satisfactory, the alleged vendee was to assume a mortgage then on the premises and pay the balance of purchase price. Here there was a clear obligation, conditional it is true, but the only conditions being on the furnishing of the abstract and the approval of title. It is unnecessary to go outside of the instrument and consider the conduct of the parties to so hold. The cases on this point are collected and exhaustively considered in a note in 3 A. L. R. 576 et seq.

(2) The next contention of the defendant is that time was of the essence of the agreement.

With respect to time being of the essence of the agreement, the defendant not only contends that it was, but further contends that she did not waive it by requesting the quitclaim deeds, even though she did not request them until the time had nearly expired. There are two answers to the contention, even though it should be admitted that time was of the essence of the original agreement. In the first place, the request in its most favorable light was ambiguous. It did not require in express terms that the deeds be procured within the 30 days. It requested them at once, if possible, and asked plaintiff to let her know when they could be procured. There was an indication that in the defendant's opinion there might be some delay, and yet she did not expressly limit the time to the 30 days. Further, in a letter mailed by the plaintiff September 28, 1925, which was the 30th day, the plaintiff promised to get the deeds within a few days and forward them to Mr. Carlton. Defendant permitted the plaintiff to go ahead and get the deeds, and not only recognized the agreement as existing after the expiration of the 30 days, but apparently was entirely oblivious of the time when the 30 days expired, because the two deeds which were first executed were not executed until September 30, two days after the expiration of the 30-day period, but she raised no objection on that score when informed that they had been received, and even while on the witness stand at the trial she declared that these two deeds came in within the 30-day period. So, the defendant evidently did not construe her own request as requiring the obtaining of the deeds within the 30 days, but she recognized the agreement existing to and after the time she was informed of the arrival of the third deed, which the evidence clearly shows came to her knowledge immediately after its receipt by Mr. Carlton, right after its date, which was October 5, 1925. The request went beyond the showing of marketable title of record. The plaintiff had already done that. This request was for something additional, and even if the court should go so far as to concede that to take advantage of the offer to accept the quitclaim deeds it would be necessary to have them ready for delivery within the original 30-day period, the plaintiff was not able to procure them within that time, but she went ahead after the 30-day period, to the knowledge of the defendant, and without objection on the part of the defendant, not only endeavoring to get the deeds as promptly as she could, but actually doing it and informing the defendant of the fact at a time when it is clear from the evidence that the defendant was still recognizing the existence of the agreement. So, secondly, at best there could only have been a default of which the defendant did not take advantage, but which, on the other hand, she waived, and by the waiver, time, if it ever was of the essence, ceased to be so. The recognized rule is stated by Mr. Pomeroy, as follows:

"If the court finds that although time was of the essence of the contract, yet the defendant has waived his right to insist upon strict performance either expressly or by acquiescence in plaintiff's laches, as where his conduct after the failure to perform on the day indicated that he would accept a delayed performance, a decree for specific performance will be granted the plaintiff as if time had not been of the essence." 5 Pomeroy's Equity Jurisprudence (2d Ed.) sec. 2235, p. 4988.

—under which Pomeroy cites numerous cases, including Livengood v. Ball, 63 Okla. 90, 162 Pac. 766; and Berry v. Second Baptist Church of Stillwater, 37 Okla. 117, 130 Pac. 585, both of which quote the text with approval.

And in stating what the rule referred to

was when time was not of the essence of the agreement, Mr. Pomeroy said:

"Where time is not of the essence, the time in which the party in default may have a further right to receive performance may be limited by the party not in default giving reasonable notice that performance must be made by a certain day." 5 Pomeroy's Equity Jurisprudence (2d Ed.) sec. 2235, pp. 4995-6.

Mr. Williston, in his work on Contracts, says that where either at law or in equity time is of the essence of the contract, it may be waived by the injured party and he may elect to continue in spite of the breach. 2 Williston on Contracts, sec. 856, p. 1637, to which is appended the following note:

"Where time of performance is of the essence of the contract, a party who does any act inconsistent with the supposition that he continues to hold the other party to his part of the agreement will be taken to have waived it altogether. King v. Wilson, 6 Beav. 124; Baker v. Bishop Hill Colony, 45 Ill. 264; and cases cited in 29 Am. & Eng. Ency. of Law, vol. 29, p. 1104.

"When a specific time is fixed for the performance of a contract and is of the essence of the contract and it is not performed by that time, but the parties proceed with the performance of it after that time, the right to suddenly insist upon a forfeiture for failure to perform within the specified time will be deemed to have been waived and the time for performance will be deemed to have been extended for a reasonable time. King v. Radeke, 175, Ill. 72, 51 N. E. 698; Moline Malleable Iron Co. v. McDonald, 38 Ill. App. 589."

Mr. Williston does not disagree with the rule that in such cases a reasonable time is allowed, but feels that the statement that in such cases there cannot be rescission without giving notice to perform within a specified reasonable time, stated as a broad proposition, goes too far. It is unnecessary to decide when a notice fixing a reasonable time is unnecessary, because in this case the court held that the deeds were obtained within a reasonable time, and the defendant did not except to the finding. However, this review of the authorities enables us better to distinguish the case of Garrett v. Cohen, 63 Misc. Rep. 450, 117 N. Y. Supp., 129, upon which the defendant relies, contending that although the quitclaim deeds were not requested until near the time for performance, the request did not extend the time, that time was originally of the essence and continued to be in spite of the request.

The case was not in point. There the vendee was purchasing a building site, the season was getting late, and he was suffering damage by each day's delay. It was known when the contract was made that the vendor would have to acquire the interests of some minors. On the day fixed for performance the vendor informed the vendee that he could not deliver the title then and could not deliver it for three or four days or a week. Vendee agreed to such extension. There was at least one other extension, and it does not appear that it was to a definite time. The day fixed for performance was April 28th, and on May 21st vendee demanded a return of his deposit, and the vendor at that time told him that he did not know when he would be able to deliver title. The court not only said that by agreeing to wait a week the vendee did not agree to wait forever, but it went further and said that the extension was a mere indulgence that vendee could revoke at will, and said that that was so, especially because the vendor had later sold to a third party without loss. We cannot understand how the later sale had anything to do with the matter, and we cannot see how the extension was a mere indulgence. It was given on the last day, when the vendee had the election to consider the agreement terminated or to consider it still binding. As a matter of fact, the extension was procured by a false representation of the vendor, and it would have been voidable, but we cannot see how it could be held to be a mere indulgence. Even though it had not been obtained by false representations, since on May 21st the vendor admitted that he did not know when he could deliver title, it was an admission that he could not perform within a reasonable time and that would justify the vendee in rescinding and demanding the return of the deposit, for under such circumstances fixing a reasonable time would be a vain act. Such a case would seem to be a reason for Mr. Williston's statement that notice fixing the reasonable time is not always necessary.

That case certainly is not authority for the contention that performance is insufficient and is out of time which, while performed after the day on which the defendant claims was originally of the essence of the agreement, it was not only done within a reasonable time thereafterwards, but was done while the defendant recognized the agreement as existing.

(3) The contention that tender was necessary is unavailing, because it is evident that if a tender had been made it would have been refused. Rupard v. Rees, 94 Okla. 49, 220 Pac. 893; Grier v. McCormick, 100 Okla. 36, 227 Pac. 400; Mitchell v. Reeder, 104 Okla. 48, 231 Pac. 268; Kingkade v. Plummer, 111 Okla. 197, 239 Pac. 628.

There remain for consideration only the contentions of the plaintiff, and since this case is one of strictly equitable cognizance, if it is found that the findings and judgment of the trial court were against the clear weight of the evidence, or that the judgment was contrary to law, this court is empowered not only to reverse the judgment, but also to render or cause to be rendered such judgment as the trial court should have rendered. Pevehouse v. Adams, 52 Okla. 495, 153 Pac. 65; Marshall v. Grayson, 64 Okla. 45, 166 Pac. 86; Martin v. Bruner, 64 Okla. 82, 166 Pac. 397; Hart v. Frost, 73 Okla. 148, 175 Pac. 257; Lee v. Little, 81 Okla. 168, 197 Pac. 449.

The court was in error in its conclusion in finding No. 6, in concluding that defendant talked to plaintiff about the title when she went to Oklahoma City or that the defendant went to Oklahoma City and had the talk with Mrs. Burns, plaintiff's mother, after she had written to the plaintiff requesting that she obtain the quitclaim deeds. The defendant herself testified that she went within two weeks after the making of the contract, which would have been not later than September 12th, and the deeds were not requested until September 24th, and she testified positively and directly that she went and had the talk with Mrs. Burns before she requested the deeds, and that she requested them and was anxious to get them because of that conversation.

It would be unusual if a person, having seen Mrs. Burns break down and weep and declare that she had been coerced into making the conveyance to the daughter, would commission the daughter herself to obtain another deed by coercion, or would commission anybody else to get a deed, or would go on with the contract or hesitate or omit to unqualifiedly and plainly assert the reason for the termination.

Defendant testified that on her return she wrote for the deeds and told the plaintiff what she alleged in her testimony the mother had said in that conversation. It appears from her own evidence that such was not the fact. When she wrote for the deeds she said that the party making her a loan had requested them, and 'the only reason given was the fact of the advanced age of the mother eight years earlier when she had executed the deed to the plaintiff. This request was not made until September 24th, and in the meantime she had taken the abstract to Mr. Stevens, who was the third attorney whom she had consulted, Mr. McMahon having examined it after the examination by Mr. Williams, but it not appear-

ing whether his examination was after the Wallace conversation, or when it occurred with reference to the time of the trip to Oklahoma City. But it appears that she consulted Mr. Stevens after her return from Oklahoma City after talking with Mrs. Burns, and it would be very strange if she did not detail to him the conversation which she had had with Mrs. Burns, and if she had detailed any such conversation it would be difficult to believe that he, as a lawyer, or even had he been a layman, would have suggested commissioning the person who had coerced the mother, or any other person, to obtain a deed from her after she had broken down and wept and asserted that the plaintiff's deed had been obtained by coercion. It would be strange if negotiations had not been terminated immediately upon her recital of any such conversation to Mr. Stevens. Her failure to inform plaintiff of the alleged conversation is indicative that it was not had; her request for the deeds only on the ground of the advanced age of the mother is indicative that it was not had; and her lack of frankness in not admitting that it was her own attorney that had requested the deeds and the attempt to induce plaintiff to believe that the deeds had been requested by the party who was to make her a loan, which it is undisputed was on a farm and not on this improved city property, indicate that no such conversation was had; it further indicates a lack of faith in any valid objection to the title, and it is not at all incompatible with the idea that even as early as that the defendant had it in mind to refuse performance, and to refuse it with the knowledge that there was no valid objection to the title, and that she figured that the way out would be to follow the so common American custom known as "passing the buck," to avoid explanations which she realized it would be impossible for her to make or sustain.

The court not only cannot conclude that any such conversation was had with Mrs. Burns, but the clear weight of the evidence, and the conduct and testimony of the defendant herself, indicate that it did not occur, and the positive testimony of the defendant that it was as she testified necessarily seriously impaired her credibility. Not only this fact, but the attitude of the defendant from that time on, and her conduct and statements on the stand, indicate clearly that she did not consider the title not to be merchantable, that there was any reasonable doubt, or any doubt whatever, as to its validity, but that, realizing herself to be bound, she still desired to evade performance, that this evasion was a much de-

sired end, and that her desire to obtain the end overcame her judgment and rendered her incapable of displaying a sense of proportion or compatibility.

She admitted on the witness stand that Mr. Carlton, at least to the end of the 30 days, was diligent in urging her to perform. The plaintiff and Mr. Carlton both exercised promptness in the matter up to and including the getting of the deeds. The agreement was made August 29, 1925, and the abstract was furnished, and the deed to the defendant was ready, August 31, 1925. The opinion of Mr. Williams was returned to Mr. Carlton promptly, it having been dated September 2nd, and promptly sent to him. The rendition of the title opinion by Mr. Williams was the last act of promptness shown by the defendant, and that was not her own personal conduct. It appears by her own testimony that right after this opinion was given, she had the conversation with Mrs. Wallace and her son, and that she waited five days before going to Oklahoma City. On her return she waited at least twelve days more before requesting the deeds. She delayed for that time in spite of the fact that she admitted that Mr. Carlton was urging her to be ready to perform within the 30 days, and in spite of the claim that she made in the letter that she was in a great hurry to have them. Contrasted to that is the fact that on that very day that she requested them Mr. Carlton sent them to the plaintiff, that the plaintiff took immediate steps to have them executed, that she wrote defendant a letter on September 28th, which would seem to be the day after she received the request, that she would obtain them within a few days and would send them to Mr. Carlton, which letter was posted September 30th, after the expiration of the 30 days, but with considerable promptness, and at a time when the defendant was recognizing the contract as still in force. The delay in getting the third deed was explained by the fact that the brother signed by initials, which necessitated the plaintiff, in her opinion, sending him another deed for execution, which was executed October 5th and was sent right down to Mr. Carlton and was received by him, as he testified, within a few days after the receipt of the other two deeds. The defendant herself claims that after she received the proceeds of the farm loan, which she admits were not received for some weeks after the expiration of the 30 days, she kept the money on hand to see if plaintiff would procure the deeds. Considering the fact that the plaintiff was diligent at all times up to and including the getting of the deeds and getting them into the hands of Mr. Carlton, the fact that the defendant recognized the contract as existing long after the expiration of the 30 days, and that she had informed plaintiff that on account of the condition of the oil business she wanted them as soon as possible, it would be against the clear weight of the evidence to conclude that the defendant was not promptly informed that all three deeds had come into the hands of Mr. Carlton. Things do not happen that way. The clear weight of the evidence is that they did not happen that way. We not only have evidence of the promptness of plaintiff and Mr. Carlton up to that time, but we have the defendant's own assertion that she wanted them as soon as possible, and that was coupled with her claim that the loan, which was not even received until much later, was kept on hand for some time to see if the deeds would be procured, and these circumstances are altogether too strong to be overcome.

It is noticeable that in the letter of November 28th the defendant made no reference to the deeds. That letter was extremely vague. It contained a mere assertion of a cloud, not stating what it was, and its very vagueness makes against the defendant. The letter of December 3rd, after the letter of November 28th had failed to obtain a return of the check, was more specific, but that letter made no reference to the talk with the mother, but only said that defendant had been told that the father had left a will which had been destroyed, and it would naturally indicate an intention to claim that in spite of the obtaining of the deeds, they would be inoperative as against the prohibition which it was claimed was contained in the will of the father. That was in substance what was later claimed, and it indicates a shifting of position; and why was this necessary if the requested deeds had not to the knowledge of the defendant already been procured?

It is strange that the defendant did not inject this alleged coercion into the transaction before she took the stand to testify. The answer alleged that the plaintiff had procured her conveyance from Mrs. Burns by false statements, representations, and promises. It was not only remarkable for its vagueness, but it is more remarkable in omitting any reference to the alleged coercion. It appears from the record that in the confusion attending the trial the trial judge, in passing on an objection to the introduction of certain evidence, being under a misapprehension as to the issues, made the erroneous, inadvertent remark that the defendant contended that the mother had

been coerced into executing the deed. A few moments later the defendant was called to the stand and in her testimony gave the alleged details of her conversation with Mrs. Burns. It doesn't appear that she ever before made that claim; it was not even asserted by her that she had ever before made such a claim; and we can consider the details offered by her in evidence as evidentiary only of her susceptibility to suggestion, even inadvertent and unintended suggestion, and a readiness in her zeal to use any weapon that she might consider designed to accomplish the end desired.

Further, in view of the zeal shown by the defendant's attorney at the trial, we cannot believe that had he been informed of any coercion he would have omitted to assert it in the answer, and it is very doubtful if he would have been willing to even ask for a quitclaim deed from the mother, to have requested it of the party guilty of the alleged coercion, or that after he made the request for the deeds he would have given Mr. Carlton to understand, as he argumentatively asserted he had (by asking Mr. Carlton if he did not know it), that he (Mr. Stevens) was not to have anything to do with closing the transaction (after requesting the deeds).

Mrs. Tedford to some extent testified in corroboration of the defendant as to some remarks claimed to have been made during the conversation at defendant's home between defendant and plaintiff, but she could not remember anything else that transpired during the conversation, although she said that they were excited and talked loudly. She was not in the room, but was in an adjoining room, and she gave as a reason for remembering the two or three snatches of the alleged conversation that she knew of the transaction. Since she roomed at the defendant's home, it is quite probable that she heard much about the transaction, and she could easily be confused as to just what was said in that conversation and who had said it. The plaintiff admitted that there was some conversation there that day about the will, but did not expressly say that defendant told her that the mother had told her about it, and if defendant did then make such an assertion, it is the first time that we find her communicating a claim to plaintiff that any of the information came from the mother. Plaintiff said that the matter of her refusal to sell to Mr. Wallace was not mentioned during the conversation at the house, but was had before the agreement was executed, and she does not say that defendant ever told her that her mother said that she was not to convey the property during the lifetime of the mother, and if the

defendant did say in that conversation that the mother had made such a statement, it is also the first time that we find her communicating such claim to the plaintiff. The plaintiff denied saying that her mother's testimony would not be taken in court, and said that it was the defendant who made that statement, and that she replied that there was nothing physically or mentally wrong with the mother other than that she was not physically fit to go on the witness stand. The plaintiff's version is much the more reasonable. The defendant was undoubtedly refusing to accept the quitclaim deed of the mother, and that statement would naturally be made as a ground for the refusal. On the other hand, the plaintiff was offering the quitclaim deed and would naturally be insisting upon its validity and would not be reasonably expected to declare or even admit that the mother was mentally incompetent.

Mrs. Thompson strongly corroborated the plaintiff in the assertion that the defendant knew of the Wallace transaction before she made the contract, and she corroborated Mr. Carlton in his contention that he had informed defendant of the arrival of all of the deeds. Besides that, Mrs. Thompson testified that she told the defendant what she knew about the title, and that involved telling her about a conversation that she had with the mother at one time when she thought of buying the property and the statement that she found nothing wrong with the title, clearly referring to the conversation with the mother, for she said that she had not otherwise inquired into the title. Aside from the testimony of Mrs. Tedford, who might easily have been confused and mistaken, there is no more reason to think that in the conversation at the house the defendant charged that the mother had given her any information than there is to think that the defendant wrote such charges to the plaintiff. The defendant asserted just as strongly that she wrote those things to the plaintiff, and it is clear from the evidence that she did not write them to the plaintiff, but rather seems to have studiously avoided claiming that the mother was the source of the alleged information. Since it would be just as likely that she wrote it as that she said it, and it is clear from the defendant's own letters that she did not write it as she alleged she did, there would seem to be no good reason that could be advanced for giving greater weight to the one claim than to the other. As between the plaintiff and Mrs. Tedford with regard to an appreciation and recollection of the details of the conversation at the house, the plaintiff would be much

more apt to know and remember those details than would Mrs. Tedford. It would be rash to think that the plaintiff did not know or did not remember, and there does not appear anywhere in the record an indication of any lack of truth, frankness, indecision, contradiction, or confusion on the part of the plaintiff that would throw distrust on her knowledge, recollection, or veracity.

The court cannot avoid the conclusion that the overwhelming weight of the evidence shows that there was no defect in the title of the plaintiff, that there was no reasonable ground to believe that it was defective, that there was no reasonable ground to expect it to be involved in litigation, that any statements made to the defendant that might have been considered derogatory to the title were fully investigated by her and found to be without foundation, and that the title was clearly merchantable; and it appears from the clear weight of the evidence that the title was not rejected in good faith.

Even though it could be conceded that the defendant received the information to which she testified, even including the statement of coercion, and even if proof of coercion should have been within the issues as framed, since all the information alleged in the record was obtained and investigated, and after investigation she had conferred with counsel, and had then only made a request for these deeds, it is doubtful if she could object to accepting the deeds, and if she did not waive any other requirement, or that there would remain anything which would prompt the discretionary exercise of a court of equity to deny specific performance on the procurement of the deeds or permit the defendant to defend further than to deny the procuring of the quitclaim deeds, but the court has not based its decision on that ground and does not decide that point, having preferred to base the decision on the entire record in the case, giving consideration to all of the claims of the defendant appearing in the transcript and case-made.

The judgment of the trial court is reversed, with instructions to enter a judgment against the defendant for the unpaid balance of the purchase price, with legal interest, less the net income, and a judgment for specific performance of the contract. Since the last deed was obtained about October 5, 1925, and since rental periods usually follow the calendar months, the variation is so slight that interest and net income should be computed from October 1, 1925.

LESTER, C. J., CLARK, V. C. J., and HEFNER, CULLISON, and McNEILL, JJ., concur. KORNEGAY, J., dissents. RILEY, J., not participating. ANDREWS, J., absent.