McCUBBINS v. SIMPSON et al.

*98 P. 2d 49.*

No. 28794.   Nov. 7, 1939.

Rehearing Denied Jan. 16, 1940.

Application for Leave to File Second Petition for Rehearing Denied Jan. 30, 1940.

Paul G. Darrough and Bland West, both of Oklahoma City, and Brown Moore and Guy Horton, both of Stillwater, for plaintiff in error.

Wilcox & Swank, of Stillwater, and T. Austin Gavin, of Tulsa, for defendants in error.

OSBORN, J.   This action was instituted in the district court of Payne county on January 5, 1938, by Ernest McCubbins against George Simpson and Mabel Simpson, as an action to compel specific performance of a contract to convey an undivided one-half of the mineral rights in 80 acres of land located in Payne county. J. H. Loyd, Helen F. Jones, and Thomas E. Berry acquired certain mineral interests in the land subsequent to the execution of the contract with plaintiff and were made parties defendant. Wanona Keith Mahany, a subsequent grantee of J. H. Loyd, entered the case by petition in intervention. The cause was tried before the court and judgment entered denying plaintiff's prayer for specific performance, canceling his contract and quieting title to the mineral interests in the defendants. From said judgment, plaintiff has appealed. The parties will be referred to as they appeared in the trial court.

Plaintiff McCubbins was a dealer in oil and gas properties and lived at Perry,

Okla. Defendants George and Mabel Simpson lived on a farm near Drumright, but owned the 80 acres of land involved herein, which was situated in Payne county. It appears that a well known as Ramsey No. 1 was being drilled about one-half mile south of the land involved herein.

On December 24, 1937, McCubbins, in company with one Albert Vandeventer, went to the Ramsey No. 1 well and learned that the drillers were running pipe and setting cement in the well preparatory to making a test. He was informed where the Simpsons lived and in company with Vandeventer and Barney Wolverton, a notary public, drove to the Simpson home near Drumright. After some bargaining with Simpson an agreement was entered into for a sale to plaintiff of one-half of the mineral rights in the Payne county property at a price of $60 per acre, or a total of $2,400. Plaintiff prepared a contract of sale, which was signed by George and Mabel Simpson and acknowledged before Wolverton, the notary public. The contract provided for six days' time in which to examine the title and provided that payment was to be by draft drawn on the buyer (McCubbins). Plaintiff prepared a draft, drawn upon himself, in care of the First National Bank & Trust Company of Tulsa, which was signed by George D. Simpson. It was agreed that the collecting bank should be the Citizen's State Bank of Drumright, and the name of that bank was inserted in the contract. A mineral deed and a carbon copy thereof were also prepared by McCubbins, signed by George Simpson and Mabel Simpson, and acknowledged before Barney Wolverton, notary public. The negotiations were concluded about 4 o'clock p. m., and it was agreed that it was too late to deposit the papers in the bank that day. Two copies of the mineral deed, the draft, and one copy of the contract were left in the possession of the defendants.

The next day was Christmas, Saturday, December 25th. On that day Cecil G. Jones, an abstracter and dealer in oil properties, called at the Simpson home and offered "$70 per acre for 20 acres of the royalty," which offer was accepted and a conveyance executed by the Simpsons. The mineral deed was dated December 24, 1937, and recorded December 27, 1937. The grantee named in the deed was Helen F. Jones, wife of Cecil Jones.

On Monday, December 27, 1937, plaintiff went to the bank at Drumright to see if Simpson had deposited the deed and the draft for collection. He learned that the papers had not been deposited in the bank and went to the Simpson home accompanied by one James McClelland. There is some conflict in the evidence as to the conversations had at that time. It appears that defendants were demanding payment in cash for the conveyance and were dissatisfied with the draft; that McCubbins offered to reduce the time for examination of the title, and payment of the draft to two days; that defendants informed McCubbins of the sale of "royalty" to Jones, and told him that Jones would buy more and pay cash.

On Monday, December 27th, McCubbins deposited $2,500 in the First National Bank & Trust Company at Tulsa for the purpose of meeting payment of the draft.

On December 27th Cecil Jones came to the Simpson home about 5 or 6 o'clock p. m., and purchased "40 more acres of royalty, this time at a price of $60 per acre." One J. H. Loyd, an employee of Jones, was named grantee in this deed. It appears that Jones paid the Simpsons by making deposits to their credit in the bank; on December 27th he deposited $1,400; on December 30th he deposited $150; on December 31st he deposited $2,500.

McCubbins placed his contract on record on December 28th, after he had examined the record and found the mineral deed to J. H. Loyd.

On December 27th, Helen F. Jones conveyed an undivided one-eighth interest in the minerals to Tom E. Berry. The interests of the intervener, Wanona Keith Mahany, were acquired from J. H.

Loyd by two mineral deeds, the first dated December 31, 1937, and recorded January 3, 1938; the other was dated January 3, 1938, and recorded January 19, 1938.

It appears that Ramsey Well No. 1 was brought in as a producer on January 2, 1938, and began producing at the rate of approximately 1,200 barrels of oil per day. It is agreed that before the well was brought in, $60 per acre was a reasonable price for the mineral interests herein involved; that after the well was brought in, the interests were reasonably worth $500 to $600 per acre.

The facts hereinabove outlined constitute the undisputed facts in the case. There was considerable conflict in the evidence in various particulars which will be hereinafter noted in discussing the propositions of law.

The principal contention of plaintiff is that the judgment of the trial court refusing specific performance is contrary to the clear weight of the evidence, while defendants' argument in support of the judgment of the trial court is divided into various propositions.

Among other things, defendants contend as follows:

"The specific performance of a contract by a court of equity is not a matter of absolute right in the parties demanding the same, but is a matter of grace, application for such relief being addressed to the sound discretion of the court. It is a matter for the court's discretion and not of right, even though a legal contract is shown to exist."

It is the rule in this jurisdiction that specific performance of a contract is not a matter of right but a question of equity and the application is addressed to the sound legal discretion of the trial court and controlled by the principles of equity in full consideration of the circumstances in each case. Crutchfield v. Griffin, 139 Okla. 35, 280 P. 1075; Miller v. Roberts, 140 Okla. 271, 282 P. 1104; Vanlandingham v. Newberry, 104 Okla. 98, 230 P. 726; Hurst v. Champion, 116 Okla. 228, 244 P. 419; Robinson v. Haynes, 147 Okla. 95, 294 P. 803.

In 65 A.L.R. 9, appears the following note:

"* * * Giving a literal interpretation to the expressions of the courts upon the subject there appears a remarkable harmony of opinions to the effect that the granting of relief by a decree or judgment requiring specific performance of a contract rests in the 'sound' or 'judicial' discretion of the court."

A very clear statement of the rule is found in Pomeroy's Equity Jurisprudence (4th. Ed.) vol. 4, sec. 1404:

"* * * The remedy of specific performance is governed by the same general rules which control the administration of all other equitable remedies. The right to it depends upon elements, conditions, and incidents, which equity regards as essential to the administration of all its peculiar modes of relief. When all these elements, conditions, and incidents exist, the remedial right is perfect in equity. So far as these essential elements and conditions do not relate to the existence of contracts binding in equity, they are nothing but expressions and applications of the fundamental principles, he who seeks equity must do equity, and he who comes into equity must come with clean hands."

(Footnote):

"These elements, conditions, and incidents, as collected from the cases, are the following: The contract must be concluded, certain, unambiguous, mutual, and upon a valuable consideration; it must be perfectly fair in all its parts; free from any misrepresentation, or misapprehension, fraud or mistake, imposition or surprise; not an unconscionable or hard bargain; and its performance not oppressive upon the defendant; and, finally, it must be capable of specific execution through a decree of the court."

It thus appears that the granting of specific performance is not wholly a matter of grace nor of unbridled discretion on the part of the trial court. The above authorities very clearly outline the scope of our review. We must determine whether or not the trial court properly exercised a "sound" or "judicial" discretion in denying plaintiff's prayer of specific performance, in the light of the

evidence presented, and in accordance with the established principles of equity.

Defendants further contend that the contract of sale is void for lack of mutuality; that the same is a mere unilateral option to purchase. The pertinent provisions of the contract, omitting its formal parts, are as follows:

"1. Sellers agree to attach mineral deed (or conveyance) which has been duly signed and acknowledged according to law, covering said undivided interest as above set forth in said above-described lands, to a draft drawn upon the above buyers, in care of First National Bank of Tulsa, Okla., in the sum of twenty-four hundred dollars, and to deposit same for collection with the Citizens Bank of Drumright, Okla., immediately following the execution of this instrument.

"2. Sellers agree to furnish buyer with a complete abstract of title to the said above-described lands down to date of this agreement, showing good and valid title in sellers.

"3. Sellers agree that buyer shall have 6 days from receipt of said abstract by the buyer, at the collecting bank first above mentioned, in which to have title examined.

"4. Sellers shall be furnished with such exceptions to said title as may be found thereto by buyer or his attorneys, in writing, and sellers agree to forthwith remove such exceptions to the satisfaction of the buyers, but in the event of failure of sellers to clear said title to the satisfaction of the buyers within a reasonable length of time after notice of said exceptions, then and in that event buyer shall have the right and privilege of engaging in the work of clearing up said title and removing such objections as may be required, and it is expressly understood and agreed that the time limit as provided for in paragraph 3 above written is hereby extended to provide such additional time as is necessary to perfect said title.

"5. In the event title is found finally to be unsatisfactory to buyer, it is expressly agreed and understood that buyer shall have the option of rejecting conveyance herein provided for, thereby rendering this agreement null and void and of no force and effect and buyer shall not be liable in damage to the seller."

The principal objection is made to the obligation to furnish a title *satisfactory to the buyer*. It is urged that said provision has the effect of creating a mere option to purchase and would permit the buyer to nullify the binding provisions of the contract by refusing the title tendered by the seller regardless of the condition of the title. In the case of Ruland v. Bohner, 149 Okla. 36, 299 P. 167, it was held:

"A contract reciting that A has agreed to sell and convey property to B, which provides that A is to furnish an abstract of title and that B is to be allowed to have the same examined, and that, if the abstract shows title satisfactory to B, B is to assume an incumbrance and pay a cash balance on purchase price, is not only an agreement to sell, but is a contract to purchase, and, while it is conditional on the title being satisfactory, it is not a mere option."

In the case of Ogg v. Herman (Mont.) 227 P. 476, it was said:

"* * * We approve the rule announced in Duplex Safety Boiler Co. v. Garden, 101 N. Y. 387, 4 N. E. 749, 54 Am. Rep. 709, as follows:

" 'That which the law will say a contracting party ought in reason to be satisfied with, that the law will say he is satisfied with.'

"In Folliard v. Wallace, 2 Johns. (N. Y.) 395, Chancellor Kent said:

" 'A simple allegation of dissatisfaction, without some good reason assigned for it, might be a mere pretext, and cannot be regarded. If the defendant were left at liberty to judge for himself when he was satisfied, it would totally destroy the obligation, and the agreement would be absolutely void. * * * The law in this case will determine for the defendant when he ought to be satisfied.'

"In Moot v. Business Men's Inv. Association, 157 N. Y. 201, 52 N. E. 1, 45 L.R.A. 666, it was said:

" 'A good title must be regarded as a satisfactory one.'

"In Fagan v. Davison, 9 N. Y. Super. Ct. 153, it was said:

" 'A title, satisfactory to the party to whom it is to be given, means a title to which there is no reasonable objection, and with which therefore the party to whom it is tendered ought to be satisfied. When such is its nature, so far from having a discretion to reject, he is bound to accept it."

"In support of our views, reference is made to the following additional authorities: Pennington v. Howland, 21 R. I. 65, 41 Atl. 891, 79 Am. St. Rep. 774; Latrobe v. Winans, 89 Md. 636, 43 Atl. 829; Dillinger v. Ogden, 244 Pa. 20, 90 Atl. 446, Ann. Cas. 1915C, 533; Whited v. Calhoun, 122 La. 100, 47 South. 415; Dean v. Williams, 56 Wash. 614, 106 P. 130; Giles v. Paxson (C. C.) 40 Fed. 283; Winter v. Stock, 29 Cal. 408, 89 Am. Dec. 57; 27 R.C.L. 487, and note to Ann. Cas. 1915C, 536."

See, also, Williams v. Belling (Cal. App.) 245 P. 455, and cases therein cited.

Although there is some conflict in the authorities (27 R.C.L. 487, sec. 204, 66 C. J. 743), it appears that the overwhelming weight of judicial opinion is in harmony with the rule announced in the cases hereinabove referred to. We are therefore of the opinion that the contract is not void for lack of mutuality, but in the event of a failure on the part of plaintiff to perform, defendants would be entitled to enforce the provisions thereof against plaintiff.

It is further contended on behalf of defendants that there was no delivery of the contract involved herein. In this connection the record shows that defendants were advised that the well known as Ramsey No. 1 would shortly be tested and that the outcome of said test would determine whether or not the mineral interests in their land would be valuable; that they desired to complete a sale before the well was tested while they could obtain a substantial price for their mineral rights. Defendants insist that the sale was to be for cash. It is noted that under the terms of the contract which the parties executed plaintiff was to have six days in which to examine the title. As heretofore stated, when the contract was signed, plaintiff delivered a six-day sight draft upon himself signed by the defendant George Simpson, in care of the First National Bank & Trust Company of Tulsa. Defendants contend that it was their understanding that plaintiff was to give them a check at the time they delivered the contract of sale, and that the transaction would then and there be closed. But instead of delivering such check to them, he gave them a six-day draft and thereby procured possession of the contract of sale. Although there is considerable argument by the parties regarding the issue of delivery, in its final analysis the position of defendants is that they thought the six-day draft delivered to them by McCubbins was a check and that he thereby procured the delivery of the contract by fraud. It is conceded that the general finding of the trial court includes such specific findings as are necessary to sustain the judgment, and it thus appears that the trial court found that plaintiff practiced such fraud upon the defendants, and in this connection it is necessary to refer to the evidence to determine whether or not such finding is contrary to the clear weight thereof. Mabel Simpson testified that after the papers had been executed:

"A. McCubbin handed me the draft and says 'Here is your money,' and put one copy of the contract in his brief case and left. Q. When they went out, which way did they go? A. Out the living room door. Q. And the notary, did he go with him? A. Yes, sir. Q. And just after they got out, what did George do? A. I took the draft in there to him and I said 'Here is the money,' and he says 'That ain't no check' and he went to the door and they was already gone. Q. Which door did he go to? A. To the living room door. Q. And they were already gone? A. Yes, sir."

Defendant George Simpson testified:

"A. I heard Mr. McCubbins tell my wife, says 'Here is your money,' and she says, 'That is what I want,' and when I come in, I got in, and Mr. McCubbins went out the door, and she says, 'Here is your money,' and I looked at, and I says 'I don't believe we can get any money on

that' and I started to the door, I didn't know he was taking that contract, and he was gone, pulling out."

On cross-examination, however, defendant testified in regard to a conversation had with Cecil Jones on the following day in relation to the transaction with McCubbins as follows:

"A. He wanted to know if I got the money, or contracted for it. And I told him I didn't know, I thought I got a check for our money. Q. That you thought you had a check for it. A. Yes, sir. Q. Did you think you had a check for it? A. Yes, sir. Q. Did you have a check for it? A. No, sir. Q. When did you find that out? A. Monday. Q. Do you mean to tell the court that you didn't know you didn't have a check for your money before Monday? A. Yes, sir. Q. You mean to tell the court you thought, until Monday, that this paper which I am handing you as plaintiff's exhibit 'D' was a check? A. I didn't think—it was a funny looking check, and I didn't know whether we would get the money on it or not. Q. You mean to tell the court you thought this was a check? A. Yes, sir, until I took it over and seen Mr. Stevenson."

Thus it is noted that there is a conflict in the defendants' evidence regarding this point. Mrs. Simpson testified that Simpson stated when the draft was handed to him "that ain't no check." In his cross-examination he testified that he did not know that the draft was not a check until he conferred with a party named Stevenson on the following Monday. Defendants' evidence to the effect that they were deceived and defrauded by plaintiff in his misrepresentations that the draft constituted a check does not harmonize with other testimony to the effect that defendants had a joint bank account and both were accustomed to drawing checks against their account; it does not harmonize with the terms of the contract of sale which was signed and executed by defendants specifically providing that the payment was to be made by draft upon approval of the title.

In this connection defendants do not contend that they did not read the contract. Mrs. Simpson testified that they looked the papers over before they signed them and Mr. Simpson testified that he tried to read the contract but "a lot I didn't understand." In the case of J. B. Colt Co. v. Thompson, 114 Okla. 61, 242 P. 1030, this court quoted with approval from the case of Upton v. Tribilcock, 91 U. S. 45, 23 L. Ed. 203, as follows:

"It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained. If this were permitted, contracts would not be worth the paper on which they are written. But such is not the law."

In the case of McNinch v. Northwest Thresher Co., 23 Okla. 386, 100 P. 524, it was said:

"Where one who can read signs a contract without reading it or having it read to him, he is bound by it, although its provisions are different than he supposed."

The contract is clear and explicit to the point that payment was to be made by draft within six days upon approval of the title. The defendants George and Mabel Simpson were given physical possession of the draft. The evidence discloses sufficient business experience on the part of either of them that they should have been able to appreciate the difference between a check and a six-day draft. To sustain defendants' contention in this respect would be to establish a precedent by which all written contracts might be nullified by the parol evidence of one of the parties to the effect that the terms of the contract were not understood. This we cannot do. We are driven irresistibly to the conclusion that the implied finding of the trial court that there had not been a valid delivery of the contract of sale is contrary to the clear weight of the evidence.

We pass to a consideration of the general equities. Defendants argue that the contractual arrangement entered into between the parties herein was the result of a scheme on the part of the plaintiff, McCubbins, to secure what is re-

ferred to as a "free ride." In other words, that during the interim between the date of the contract and the approval of the title the test well adjacent to the defendants' property would either have proven their property to be valuable for oil purposes or would have condemned it; and that in the event the well failed to produce oil, plaintiff, McCubbins, would have repudiated the contract and defendants would have been deprived of an opportunity to procure a substantial price for their property before it was condemned in the event the test well failed to produce. An examination of the entire record does not sustain defendants' position in this respect. When McCubbins called at the Simpson farm on December 24th, he informed them that preparations were being made on the Ramsey No. 1 well for a test. It does not appear that six days' time for an examination of the title, under the circumstances herein involved, was more than a reasonable time. The evidence further discloses that defendants' abstract was in the possession of the Carter Oil Company at Tulsa, and that plaintiff gave defendants a dollar and requested that they call the Carter Oil Company by long distance telephone and instruct said company to release the abstract to plaintiff's attorney in order that no time would be lost in procuring the examination of the abstract. The record further discloses that, on December 27th, after plaintiff was informed that defendants had not deposited the papers in the bank at Drumright, he offered to reduce the time for examination of the title to two days. The evidence therefore discloses that plaintiff was using every reasonable means to close the transaction at the earliest possible date, and that under either the original proposition, or the second proposition of plaintiff to reduce the time, the transaction would have been closed prior to the time the well came in, to wit, January 2, 1938. Notwithstanding the circumstances surrounding the transaction and the possibility that a dry well would have condemned defendants' property, and that a test of the well was shortly to be made, there is no positive evidence nor facts from which it may be inferred that plaintiff intended to take a "free ride" at the expense of defendants; or that there was an intention or opportunity on his part to escape carrying out the letter of his contract in the event the test well failed to produce oil.

We pass to a consideration of the claims of Helen F. Jones, J. H. Loyd, and their grantees that they are innocent purchasers without notice of the contractual arrangement with McCubbins. In this connection the record shows that on Saturday, December 25th, when the defendant Jones called at the Simpson home and purchased a 20-acre interest in the mineral rights, he was informed of the transaction with plaintiff McCubbins; that Simpson told him that he had sold 40 acres to Mr. McCubbins, but that he did not know whether or not he had the money; that he thought he "had a check for it." Jones paid the consideration for the transfers taken in the name of Helen F. Jones and J. H. Loyd by depositing the money in the bank to the credit of the Simpsons. One deposit of $150 was made on December 30, 1937, and another deposit of $2,250 was made on December 31, 1937. These deposits were made subsequent to the recording of the McCubbins contract. In the case of Lasswell v. Prairie Oil & Gas Co., 173 Okla. 278, 47 P. 2d 598, it was held that a purchaser for value, to be entitled to protection as such, must be without notice, not only at the time he makes the purchase but at the time he pays the purchase money.

From a consideration of all the facts and circumstances involved herein, it appears that plaintiff, upon a tender of the consideration fixed by the contract, is entitled to a conveyance from George B. Simpson and Mabel Simpson of an undivided one-half interest in the mineral rights in the 80 acres of land involved herein, and that the title of plaintiff be adjudged to be superior to any right or claim of title to said mineral rights by any of the defendants or their grantees.

The demurrer of defendant Thos. E.

Berry to the evidence of plaintiff was sustained by the trial court. That ruling will not be disturbed.

We express no opinion regarding the respective rights of the other defendants or their grantees as to the remaining undivided one-half interest in the mineral rights in the land herein involved.

The judgment of the trial court is reversed and the cause remanded, with directions to enter judgment in favor of plaintiff in conformity with the views herein expressed.

BAYLESS, C. J., WELCH, V. C. J., and RILEY, CORN, GIBSON, and HURST, JJ., concur. DAVISON and DANNER, JJ., absent.