**J. M. THOMPSON, Plaintiff in Error,**

**v.**

**S. B. GIDDINGS, Defendant in Error.**

**No. 35833.**

Supreme Court of Oklahoma.

Oct. 19, 1954.

Rehearing Denied Nov. 16, 1954.

Chas. Hill Johns, W. L. Funk, John Chiaf, Oklahoma City, for plaintiff in error.

A. V. Dinwiddie, Guthrie, Lloyd G. Larkin, Gene C. Howard, Tulsa, for defendant in error.

BLACKBIRD, Justice.

This action was instituted by defendant in error, as plaintiff, against plaintiff in error, as defendant, to quiet her title to 40 acres of land described as: The S½ of

the N½ of the NW¼ of Sec. 21, Twp. 7 N., Rge. 1 E., in Logan County, Oklahoma. Said defendant sought by cross-petition to obtain specific performance of a contract plaintiff allegedly entered into with him to sell him an undivided one-eighth or "five-acre" oil royalty interest in said tract. Reference to the parties by their trial court designations will be continued.

Plaintiff's home is at Langston, Oklahoma. According to the undisputed facts she had just gone to Oklahoma City to the home of her nephew, an Oklahoma A. & M. College student, when defendant, in company with another man, went there to see her on the afternoon of July 20, 1951, to ascertain if she would sell him the royalty interest. An oil well had just been drilled upon the land and a drill stem test made that morning. According to the information then had by both parties the test indicated the well would be a producer. After some discussion, and uncertainty on defendant's part, as to just which 40-acre tract plaintiff owned in the NW¼ of Sec. 21, she pointed out the above described 40 acres as hers on a map defendant procured and he finally stated he would pay her $250 per acre for the 5-acre interest. Accordingly, before he departed, he left with her his personal check for the sum of $1,250, bearing the notation in the lower left-hand corner thereof: "5 A Royalty N¼ Sec. 21–17–1", ascertained that she would be in Guthrie, Oklahoma, the next day, arranged to meet her there to have a deed to said interest drawn, executed and delivered, and obtained from her a receipt for his check. The receipt, written in plaintiff's own handwriting, is in words and figures as follows:

"July 20

"Rec'd a check from Mr. Thompson for 5 Ac, of Royalty $1250 00 to hold & Rec'd cash, money on Sat. July 21, 1951.
            "S. B. Giddings."

The next day plaintiff went to Guthrie and saw defendant, but by then she had earlier that morning been to Coyle, Oklahoma, and accepted a check for a higher price for the royalty from a Mr. Fry of that town. Accordingly, upon meeting defendant at Guthrie she attempted to return to him his check and get back the receipt she had given him. Defendant would not do this however, so she later mailed the check to him, but he has ever since retained her receipt. After defendant had instituted other litigation seeking to enforce the contract he claimed with her he dismissed it without prejudice and asserted his claim by the aforesaid cross petition in this action, wherein he has tendered to her the $1,250 in cash and established that at all times since he gave it to her there were sufficient funds in his account to have paid the check.

At the close of the trial, the trial court entered judgment for plaintiff and refused to grant defendant any relief on his cross petition, after making the following findings:

"First: The Court finds in this case that there was no common understanding or a meeting of the minds of the parties involved, that is, the plaintiff and defendant, and that the writings and statements were lacking in mutuality and understanding and was unfair and unjust and wanting in equity.

"Second: The Court finds as a fact from all of the evidence offered in said cause, that the purported writings are indefinite and uncertain and leave too much to be supplied and presumed and does not constitute a valid enforceable contract under all the evidence herein, and further finds the circumstances under which the contract was executed rendered doubtful whether the act was understood by the defendant.

"Third: The Court further finds from all of the evidence and circumstances in said cause and the general conduct of the parties that there was lack of understanding, mutuality and a gross inadequacy of consideration, all of which taken together the court finds, renders the enforcement of said alleged writings as a contract, inequitable, and that said writings and parole under all of the evidence do not constitute a valid and enforceable contract in equity and was not entered into fairly and understandingly."

In his present appeal from said judgment, defendant maintains generally that it and the findings on which it is based are contrary to law and clearly against the weight of the evidence. In the first part of his brief he attacks the Court's findings as to a valid and enforceable contract between him and the plaintiff, and his argument thereunder pertains, among other things, to the first question we consider, namely: Were the writings in the present case sufficient to render the contract (assuming that there was one) enforceable under the Statute of Frauds?

■ Plaintiff seems to recognize, as does at least one of the cases she cites, Hawkins v. Wright, 204 Okl. 55, 226 P.2d 957, that a memorandum of an enforceable oral contract for the sale of realty may consist of a variety of informal writings between the contracting parties, but she argues in substance that the check and receipt (in the language of the trial court's findings) "are indefinite and uncertain and leave too much to be supplied and presumed * * *" to be sufficient as such a memorandum. Defendant denies this and maintains that under the circumstances the check and receipt constituted a sufficient memorandum.

■ In determining which of these adverse views is correct it is well to initially recognize that though the check was never signed or endorsed by plaintiff (the party defendant seeks to have "charged" or held to the alleged contract) the receipt, which was admittedly signed by her, refers to the check. Both the check and the receipt referring to, or being a part and parcel of the same transaction, may be considered together and each as supplementing or curing any deficiencies in the other, in determining whether they together supplied the essential requirements of a sufficient memorandum under the Statute of Frauds, 15 O.S.1951 § 136. Halsell v. Renfrow, 14 Okl. 674, 78 P. 118. And see Nauman v. Powers, 147 Kan. 641, 78 P.2d 27, and other cases cited in the Annotations at 153 A.L.R. 1112, and 20 A.L.R. 363; Restatement of the Law, Contracts, Vol. I, Secs. 207, 208.

■ Plaintiff contends that the "memorandum" here does not describe the property involved with sufficient particularity. Her counsel first says that it isn't "nearly as clear and capable of reasonable interpretation as the receipt" in Hawkins v. Wright, supra. We do not agree. The receipt in that case merely described the property as the "Hawkins Place" and the Court pointed out not only that neither the realty company there, nor its employee who signed the receipt, was authorized in writing by the property owner to give the receipt, but that the insufficiency of the property's description merely as the "Hawkins Place" could be readily apprehended when it was considered that "there might be several places in the community that could properly" be designated by the same name. Also, the question of the sufficiency of the receipt as a memorandum of an enforceable oral contract was neither the sole nor the decisive question in that case, for we concluded therein that even if the receipt had been sufficient it contained a condition precedent to its efficacy that was clearly not complied with. However, this Court in that case quoted from Oakes v. Trumbo, 201 Okl. 102, 201 P.2d 916, 917, certain well-established rules relative to contracts for the sale of realty and the memorandums sufficient to render them enforceable under the Statute of Frauds in words which, if not properly understood and interpreted, might seem to lend support to plaintiff's position. In addition to showing that a real estate sale contract to be enforceable by a judgment of specific performance " 'must be certain in its terms' " and that such required certainty has reference to the identity of " 'the parties contracting, the terms of the sale and the description of the property,' " another rule quoted therein from the Oakes case states:

" 'A memorandum, to be sufficient under the statute of frauds, must be complete in itself, and *leave nothing to rest in parol.*' " (Emphasis ours.)

Other cases have said that the memorandum cannot be "added to or varied" by parol.

■ In this jurisdiction, at least, the emphasized portion of the rule, as stated, merely refers generally to the essential elements or factors of the oral contract that

the writings must supply, namely: The identity of the contracting parties and of the property involved, and the terms of sale. It does not mean that each of these essentials of a valid contract must be described completely, thoroughly or in detail. In the instance of the only one of these elements concerning which the memorandum in the present case has been questioned, i. e., the description of the property, it is sufficient in this jurisdiction, if it identifies the property with such particularity that it cannot be confused with or claimed to apply to, any other property. If the description is ample to distinguish it or set it apart from other property, then its exact and complete description may be shown by parol. A thorough examination and analysis of the opinion of this Court in Edwards v. Phillips, 70 Okl. 9, 172 P. 949, together with the cases from other jurisdictions quoted from with approval therein and citing examples demonstrating the operation of the governing principles makes it manifest that this is the position early adopted by this Court and we think it is sustained by the weight of better reasoned authorities. In addition to those above referred to see Clark v. Larkin, 172 Kan. 284, 239 P.2d 970. While the omission of the County and State in the description—one of the asserted deficiencies specifically asserted here—was not present in the Edwards case, we think it clear, under the proper application of the principles therein approved, that it is not necessary for the name of the County and State of its location to appear in the description of real estate set forth in a memorandum of a contract for its sale if said description is adequate without any addition thereto being necessary for its identification, to the exclusion of all other property of the contracting party sought to be charged with the obligation to convey it. In this connection see Patton on Titles, Sec. 55. In the present case there was no conflict or equivocation in the proof that the only land owned exclusively by plaintiff in the NW¼ of Section 21, Township 17 N., R. 1 East was the S½ of the N½ of said quarter section. Nor was there any question but that the undivided 5-acre mineral interest that the parties' contract, if any, involved,

was such portion of that specific 40 acres. It is the same 40 acres that the evidence shows plaintiff pointed out to defendant on the map he procured for the sole and only purpose of ascertaining its exact location. Not only this, but the evidence went further and established that that tract in Logan County, Oklahoma, was the only one to which the appellation or description "NW¼ Sec. 27–17–1" could apply or in connection with which such designation could correctly be used, as far as these parties and their transaction was concerned. In view of these truths it was unnecessary for said description to specifically set forth either the state or county in which the tract was located. From the undisputed evidence which, as we have seen, was competent and admissible, there can be no question that the parties neither dealt, nor intended to deal with any other tract. Accordingly, in view of the time-honored principles referred to extensively in the Edwards case and adhered to since, this Court will not be turned from its previous course and precedent by the cases from other jurisdictions that plaintiff's counsel cite. In this pronouncement we recognize that these cases, notably Hamilton v. Morrison, 5 Cir., 146 F.2d 533, Mode v. Whitley, D.C.E.D.Ill., 30 F.Supp. 129, and Smith v. Sorelle, 126 Tex. 353, 87 S.W.2d 703, (compare Busby v. Smith, Tex.Civ.App., 53 S.W.2d 138, and Kuklies v. Reinert, Tex.Civ.App., 256 S.W.2d 435), might be interpreted as contrary to such views. However, in one of plaintiff's citations, Paine v. Mikell, 187 Miss. 125, 192 So. 15, the memorandum involved disclosed neither the owner of the property (or party sought to be charged) nor, as in Hawkins v. Wright, supra, did it purport to be made on her behalf. In the Hamilton case, supra, [146 F.2d 534], the Court said that the memorandum sufficiently described neither the land nor the "kind of royalty" involved; and plaintiff's counsel seeks to use the latter part of that statement as a further objection to the memorandum involved here, citing the case of Mabee Oil & Gas Co. v. Hudson, 10 Cir., 156 F.2d 450, as authority for the general proposition that the term "royalty" may mean a share of the landowner's one-eighth of minerals

produced from his land under a lease already on it, *or,* when used in a broader sense, *it may refer* to an interest in the entire whole or ⅝ths of the minerals lying in and under the land. We do not think such an objection is tenable in the situation here. In the Hamilton case there was a conflict on this subject between the transfer forms introduced in aid of the memorandums, one purporting in one part to convey an undivided ¼th interest in "all" the oil and gas under the described land, while the other purported to convey only ¼th of the royalty payments under a lease referred to therein. Here we have no such question or issue. A well had just been brought in on the land which presumably could only have been drilled under a valid and subsisting oil and gas lease, with whose existence both parties were acquainted. There is no intimation anywhere in the record of any question in the minds of either of them as to the "kind of royalty" with which they were dealing. In the record there is nothing to cast any doubt upon the conclusion that in entering into their contract, if it be one, they used and understood the term "royalty" as it is so often used in its popular sense. In this connection see Colonial Royalties Co. v. Keener, Okl., 266 P.2d 467, and Carroll v. Bowen, 180 Okl. 215, 68 P.2d 773, and other authorities cited therein. Nor, after thoroughly examining the evidence bearing upon what transpired between the parties and bearing upon their intention as evidenced by the check and receipt, do we see anything (as is contended by plaintiff's counsel) about the way either was made out or about the circumstances surrounding the manner in which either of the persons came into possession of them, to preclude or deter application of the above rules to the present case. This brings us to a consideration of the question as to whether there was a meeting of the parties' minds, without which there could have been no contract between them. As will be recalled, the trial court found there was not, in addition to finding a lack of mutuality in the alleged agreement and a gross inadequacy of the consideration specified therein.

Our examination of plaintiff's testimony, which, on the crucial points in her counsel's argument constitutes the only support for the particular findings therein referred to, reveals it to be inconsistent, equivocal, unresponsive and evasive, to say the least, despite repeated admonitions by both counsel and the trial judge. One of the most important of these particulars concerns the circumstances surrounding her writing and execution of the receipt. Defendant's testimony was that when plaintiff wrote the receipt he did not dictate it but that she wrote it in her own words on the hood of his auto, where she followed him and his associate, after her niece, Mrs. Wilson and some man had arrived and interrupted their conversation in the house. Plaintiff admitted writing the receipt, but claimed it was dictated by defendant. She made an effort to leave the impression that defendant, and perhaps also his associate, tried to make her believe she *had* to sell to defendant. When first questioned concerning such inferred compulsion, her story was that they led her to believe this by telling her that if she sold to defendant, the well would be, or continue to be, a good one, or that she would have no "luck" with it if she didn't sell defendant the royalty involved. Contrary to defendant's more plausible testimony, she claimed that she wrote and signed the receipt in the house and (apparently upon consideration of the weakness of the showing of compulsion in her previous testimony and the reason she had advanced therefor) she later claimed she was "scared" or afraid of defendant and his associate because they were strangers and to further bolster this vein or thread of "duress" or compulsion, she mentioned some unidentified "killing". The particular excerpt of her testimony last referred to begins when she was asked on cross-examination about her signing of the receipt, and is as follows:

"Q. You didn't have to sign that paper, did you? A. I was afraid.

"Q. Afraid of what? A. He says 'I am going to make you sell to me.' *I didn't know what that meant.*

"Q. Why did they scare you? A. That ——— family, that big killing, you know, I was thinking about that. I was afraid of those men because I didn't know who they were. They

requested me to sign, and so I signed it. The quicker I sign something and get them out of there, *k*so I could go to Langston." (Emphasis ours.)

Despite such testimony, we note from an examination of plaintiff's testimony as a whole that she never did directly deny that she accompanied defendant and his associate out of her house to their car before they departed, and it is passingly strange that she would have done such a thing if she had been unalterably opposed to closing any transaction with defendant at the price the other evidence indicates was agreed upon, and that she was afraid of him and his associate and anxious to part company with them as soon as possible. The general tenor and reliability of plaintiff's testimony is further revealed in what she said about the form or blank upon which defendant's check to her was written. It had been her contention all through her testimony that she wanted no payment of any kind from plaintiff at a price of $250 per acre for the royalty and in substance that he had forced the check upon her and left it with her over her protests. Defendant, the only other eyewitness who testified, however, denied all of that emphatically. The check form used was one printed for and issued by the bank at Coyle with which plaintiff, instead of defendant, had been doing business. Defendant testified that, at the time, he had no blank checks on his own bank with him and that plaintiff furnished him the one used; and that, in his handwriting, he changed the printing on the check form so as to make it a check drawn on his bank of Cushing, Oklahoma, rather than hers at Coyle. On cross-examination, plaintiff's testimony as to this circumstance was as follows:

"Q. Did Thompson have the blank check? A. He had one, but whether he got it from the other man or not, I don't know.

"Q. By any chance, did he get it from you? A. I don't think so. I didn't have it.

"Q. You had a bank account at Coyle? A. I have blanks at my home bank. I go in and pick up blanks and carry them home.

"Q. You don't have blank checks from Cushing? A. I don't know about Cushing.

"Q. I hand you here Defendant's Exhibit 5. I want to ask you if that is not the check that was delivered to you by Mr. Thompson on July 20, 1951? A. It looks like the check. I never took the check. He left it on the table. I never took it in my hand.

"Q. You never did take it. You had it at some time eventually? A. I sure did that morning.

"Q. Is this the document he delivered? A. That looks like it.

"Q. Look it over and see whether or not that is the check? A. I said that looks like the one he had there.

"Q. That is a check for $1250.00 signed by J. M. Thompson payable to S. B. Giddings for $1250.00, and says, 'five acres royalty in the north ¼ section 21, 17, 1.' That is the check he gave you? A. That is the check he left on the table.

"Q. That is a printed check of the Coyle, Oklahoma, Bank, is it not? A. Yes, sir.

"Q. Written out on there is 'Cushing' in pencil? A. That is correct.

"Q. I will ask you as a matter of fact if you didn't get this blank check and give it to Mr. Thompson, so Mr. Thompson could write it out? A. He might have asked for a check. I don't know. I wouldn't say I didn't, because I don't know.

"Q. As a matter of fact— A. I might have given him that check.

"Q. As a matter of fact, you gave him the check, you were anxious to get the money? Isn't that right? A. No, sir; I didn't want his money without me giving him a deed."

From careful scrutiny of the above excerpt of plaintiff's testimony, it will be seen that defendant's testimony that she furnished him the blank upon which to write the check is left without direct and unequivocal denial and for this reason we must assume, with no showing to the contrary anywhere in the record, that defendant's statement

is true. Accordingly, in addition to the uncontradicted fact that plaintiff gave defendant a receipt in her own handwriting and accompanied him to his car as he left, if she was so unalterably opposed to selling defendant the royalty at which he says was the agreed price, it is also passingly strange that she would furnish him the check with which to pay her for it at that price. Even if we accept as true plaintiff's testimony to the effect that she allowed defendant, after writing the check, to leave it with her or he left it without her permission, and she wrote and delivered the receipt therefor, all against her wishes or volition and because she was "afraid" to refuse or prohibit it, still she furnishes no explanation for this assistance to a transaction that she would have the Court believe was forced upon her and was against her wishes from its inception and in all its steps or stages. Plaintiff is a college graduate and has taught school a number of years and by her own admission has had experience with lawyers and legal matters and is "familiar with transfers of property, deeds of conveyance" and such. It is impossible to believe that had she not desired to sell defendant the royalty and take his check and give him a receipt therefor, she couldn't have kept from doing so and "balked" at thus entering into a binding contract. An examination of the record as a whole impels the conclusion that she desired and intended to sell, just as defendant desired and intended to buy, the royalty, until she ascertained later that another would give her a higher price for it. To sustain plaintiff's contention that this was not the parties' mutual desire, intention, and understanding and that their "minds" never "met" upon the matter, we would have to allow her own parol evidence or testimony at the trial to outweigh, render meaningless, and nullify the signed writings or documents that passed between the parties on the occasion in question. As said concerning a somewhat similar or analogous situation in McCubbins v. Simpson, 186 Okl. 417, 98 P.2d 49, 54. "This we cannot do." Here, as there said, "we are driven irresistibly to the conclusion" that the findings of the trial court to the effect that there was no meeting of the minds or clear and definite understanding between the parties is clearly against the weight of the evidence.

We also think the finding of the Court concerning the "mutuality" of the contract entered into by the parties must be rejected. The trial judge did not specify in what respects he regarded the parties' agreement as lacking in mutuality and neither do plaintiff's counsel in their briefs. As pointed out in the reference in Superior Oil & Gas Co. v. Mehlin, 25 Okl. 809, 108 P. 545, to Pomeroy's Work on Equity Jurisprudence, a contract to be subject to specific performance must be mutual in both *obligations* and *remedy*. Viewing the facts of this case in the light of the authorities on the subject, we have no doubt that the contract involved here possessed mutuality in both of these respects. In this connection see Annotations, 65 A.L.R. 7, 40, 45–52.

As to the trial court's finding that defendant's payment of $250 per acre was a grossly inadequate consideration for the royalty, we find insufficient support in the evidence. It is true as plaintiff's counsel mentions, that the witness, John Fry, testified that he *told* plaintiff in Oklahoma City on the occasion of the transaction in question and before anything had occurred to evidence any agreement between plaintiff and defendant as to price, that "the well was still speculative and that it wasn't a producer yet, and was questionable, but it was worth in my opinion Four or Five Hundred Dollars an acre"; and it is intimated in parts of the record that Fry, himself, may have paid plaintiff as much as $300 per acre for the royalty, yet there is a total absence of any competent evidence in the record as to this or to the royalty's true or actual market value. Fry was never asked to and did not disclose just what he paid for the royalty, though he did testify that it was more than defendant paid for it. Also it was indicated that before the well was brought in or encountered the oil sand, the royalty would perhaps not have been worth more than $50 per acre, but the only definite criterion shown as to just how much the well at its particular stage had enhanced or increased that

value was defendant's price of $250 per acre. How much more than this the 5-acre interest or similar royalty would have sold for was never sought to be established. In this state of the record no court could correctly or accurately say that $250 was a grossly inadequate price. With this deficiency in the record, it is neither necessary, appropriate or possible for us to determine whether or not there was inadequacy of price. In the absence of such necessary element, the relief of specific performance defendant seeks cannot be denied on the basis of assertedly oppressive circumstances, falling far short of fraud or duress. In this connection see Annotations, 65 A.L. R., supra, beginning at pages 57–77; Restatement of Law, Contracts, Vol. II, sec. 367. We may say in passing, however, that we have carefully examined the entire record and fail to find any competent or probative evidence of any over-reaching by defendant or unconscionable advantage taken by him of plaintiff in obtaining the contract whose enforcement he sought herein. There is no injustice or oppression in compelling plaintiff to do what she agreed to do at a time when it may have been advantageous to her and it was not definitely determined how large the well would be and whether or not the royalty was worth as much as defendant paid her. Nor would the fact that questions as to its value were resolved by testing after the time of her agreement and the value of the property found to have increased, if proved, warrant refusing to carry out said agreement. In this connection, see Henry Keep Home v. Moore, 198 Okl. 198, 176 P.2d 1016; Powell v. Moore, 204 Okl. 505, 231 P.2d 695; Cities Service Oil Co. v. Viering, 404 Ill. 538, 89 N.E.2d 392, 13 A.L.R.2d 1448, 1460. When a contract for the sale of realty is entered into between parties fairly and understandingly, without fraud, oppression or hardship and for a consideration that does not appear to be inadequate, then courts have no ground for, nor "legal discretion", McCubbins v. Simpson, supra, in refusing its specific performance. They can have no concern with the wisdom or folly of such a contract. Powell v. Moore and Cities Service Oil Co. v. Viering, supra. Here the proof that the contract was entered into fairly and understandingly outweighs all evidence to the contrary and the things that plaintiff did, speak more forcefully than some of the statements she made on the witness stand. It is not contended nor established that plaintiff was incompetent to contract, and it is not inequitable to require her, to do what she agreed to do.

The judgment of the trial court is reversed and remanded to said court with directions to set it aside and enter a new judgment superseding the former one and differing from it sufficiently to order specific performance of the contract involved herein.

JOHNSON, V. C. J., and WELCH, CORN, O'NEAL and WILLIAMS, JJ., concur.

HALLEY, C. J., dissents.