Elsie McCLUNG, Plaintiff in Error,

v.

Lyman KNAPP, Defendant in Error.

No. 38726.

Supreme Court of Oklahoma.

May 3, 1960.

Rehearing Denied June 14, 1960.

Application for Leave to File Second Petition for Rehearing Denied Aug. 2, 1960.

Raymond A. Trapp, R. L. Stimpert, Blackwell, for plaintiff in error.

Roy E. Grantham, Ponca City, for defendant in error.

BLACKBIRD, Justice.

This action was instituted by Lyman Knapp, one of the sons of W. E. Knapp, deceased, hereinafter referred to as plaintiff, against Mrs. Elsie McClung, plaintiff's sister, hereinafter referred to as defendant, to enforce an alleged partially performed oral contract between the parties. According to said plaintiff's petition, the contract was entered into on November 22, 1956, and was related to two 160-acre farms that the decedent possessed during his lifetime.

The farm directly involved herein was homesteaded by decedent, and, to distinguish it from the other farm, is referred to as the "homestead". The farm, less directly involved, belonged to the State, but was occupied by W. E. Knapp previous to statehood and held by him thereafter under a preference right lease from the Commissioners of the Land Office. It is referred to by the parties as the "school land".

In March, 1942, the Commissioners, or School Land Commission, often referred to herein merely as the "Commission", ordered forfeiture of Knapp's preference right to re-lease the premises. During the pendency of said lessee's appeal to this court from a district court judgment sustaining the Commission's action (see Knapp v. State, 196 Okl. 513, 166 P.2d 86) W. E. Knapp, in accord with his desire to distribute most of his property by deed to his two sons and two daughters in equitable, or equal, shares, executed a quitclaim deed in 1945, transferring to plaintiff, who had helped him farm and improve the school land (and, after his marriage, made his home on it, beginning in January, 1942), all of his rights under the school land lease

and his title to the improvements thereon. This deed, along with another one conveying an undivided ¼th interest in the homestead farm to each of his children (and others conveying them other farms, with homes on them), was given to the oldest son, Elliott, and placed in his safety deposit box, to be recorded after the grantor's death.

In 1946, as more fully appears from Knapp v. State, 206 Okl. 363, 243 P.2d 660, the Commission instituted proceedings for the sale of the school land, and, in the process, had it and its improvements appraised. On appeal to the district court, the value of the latter was fixed at $7,500, and, during the pendency of an appeal to this court from said court's judgment, W. E. Knapp died, in October, 1951.

During the summer before Knapp's death, while plaintiff and his brother Elliott were farming the school land for him under an arrangement referred to as "custom working", it appeared probable that, because of the prospect of the Commission's winning back possession of the school land by court action, W. E. Knapp's plan for the equitable distribution of his estate after his death by delivery of the aforementioned deeds, would probably be upset, or rendered unequal or inequitable, at least in so far as plaintiff was concerned. Accordingly, the father gave plaintiff his personal check for $2,000 to be used in further defending the Knapp interests and property on said premises, and/or if such course proved impractical or unsuccessful, to recompense him for the improvements he had placed on the land during his and his brother's farming operations.

After W. E. Knapp's death, the eldest son, Elliott, made delivery of the aforementioned deeds to the school land premises and homestead farm, and he and plaintiff remained in possession of the former and planted a wheat crop late in 1951. During the winter of 1951, after Elliott had been appointed administrator of the W. E. Knapp Estate, the Commission ousted plaintiff from the school land premises and the next spring, or summer (1952) procured a neighboring farmer, Mr. Schatz, to harvest for it, the wheat crop, previously planted, as aforesaid, by the Knapp brothers. The harvested crop was sold for $7,044, and expenses incurred in connection therewith were $761.32.

The same summer (in June, 1952) the Commission, as plaintiff, commenced Cause No. 22,430 of Kay County's District Court, against the Knapp Estate's administrator, Elliott Knapp. The sum said plaintiff sought to recover therein approximated $13,000 and was alleged to be the disallowed balance of a claim of more than $15,000, which said plaintiff had presented to the defendant administrator as representing the reasonable rental value of W. E. Knapp's unauthorized occupancy of the school land, without a lease, for the approximate ten years, beginning in 1942.

In the same month (June, 1952) and before this case was ready for trial, its plaintiff transmitted to its defendant, through the latter's Oklahoma City attorney, Mr. Garnett, an offer to settle, and dismiss, the case, in consideration for payment to said plaintiff of a fund of $1,076.22 (which the elder Knapp had tendered the Commission as rental during a four-year period beginning in 1942, and had since been held in escrow), and delivery of a so-called "Special Deed" from the defendant and the W. E. Knapp heirs, transferring to the Commission all of their rights, title and interest to the improvements on the school land premises. In addition to dropping its claims against the Estate for the decedent's claimed unauthorized occupancy of the land, the Commission's proposal included its paying two-thirds of the aforementioned crop proceeds, less the cost of harvesting it ($4,696 less $761.32, or $3,934.68) to the defendant administrator. At family conferences thereafter held, the four Knapp heirs attempted to determine among themselves, and with the advice of Mr. Garnett, whether or not they should accept the Commission's proposal to settle Cause No. 22,430.

During the conferences, Elliott recommended acceptance of the proposal; and pro-

posed that Lyman (who had appeared before the Commission and "blocked" settlement of earlier litigation, and would be most affected by the then proposed one) be deeded the other heirs' undivided three-fourths interest in the homestead to compensate for his loss, by the settlement, of his claimed interest in the school land premises and/or its improvements. Finally, at one of these conferences held at the defendant's home, on Wednesday evening, November 19, 1952, the four brothers and sisters decided to accept the Commission's offer, and agreed to, and did, meet the following Saturday, November 22nd, and execute the aforementioned Special Deed submitted to them by the School Land Commission. Upon said deed's delivery, the Commission forwarded its check made payable to Elliott, the defendant administrator, for the above-mentioned wheat crop's net proceeds in the amount of $3,934.68. Thereafter, Elliott, as administrator of the W. E. Knapp Estate, obtained an order of the probate court authorizing him to pay the proceeds of the check to himself and Lyman, the plaintiff herein.

The alleged oral agreement, which plaintiff, in the present action, sought to enforce, and which he claimed the defendant, like her brother, Elliott, and sister, Eleanor Reser, entered into, to convey him the homestead farm, was alleged to have arisen out, and to have been a part of the agreement to accept the School Land Commission's aforedescribed proposal to settle Cause No. 22,-430, supra.

The testimony with reference to the decisive issues at the trial was conflicting. Plaintiff and his brother, Elliott, testified in direct contradiction to defendant and her sister Eleanor on the question of whether, at the parties aforesaid meetings of November 19th or 22nd, the defendant and Eleanor agreed to give plaintiff deeds to their respective undivided interests in the homestead farm. Plaintiff and Elliott testified that they did; defendant and Eleanor testified that they did not.

It was established that Elliott did not execute and deliver to plaintiff a deed covering his interest in the homestead until July, 1953, (many months after the November, 1952, meetings) and that Eleanor's deed to plaintiff, which was not executed and delivered to him until February 28, 1953,—instead of conveying her undivided ¼th interest in the fee, as the claimed oral agreement was alleged to have provided—conveyed him that fractional interest in only the surface rights, with the ¼th interest in the minerals being retained by her. On the other hand, it was shown that plaintiff had had exclusive possession of, and had expended substantial sums in making improvements on, the homestead farm since November, 1952. It was also shown that as late as March, 1953, when defendant had not delivered to plaintiff a deed to her ¼th interest, the parties made a trip from Kay County to Mr. Garnett's office in Oklahoma City, in an effort to dispose of the matter, and that, as a result of this meeting, Garnett subsequently drafted a written contract, never signed (and excluded from the evidence, which, unlike the claimed previous oral agreement, provided for plaintiff's brother and sisters to execute deeds to him, reserving in each grantor an undivided ⅙th mineral interest in the homestead farm.

As evidence that the hereinbefore described settlement with the School Land Commission, in Cause No. 22,430, did not hinge on the making of the alleged oral agreement with plaintiff, but was separate and apart from it, or at least was so understood by defendant, she introduced in evidence a note she wrote plaintiff after one of the aforementioned November family meetings, by way of apologizing for having laughed " * * * when Lyman asked about homestead * * *". In this note she further stated: " * * * I didn't think School Land settlement hinged on our settlement. *That* School Land first and settlement sec."

At the close of the trial, the court, upon specifically finding that the oral contract alleged in plaintiff's petition was entered into, and that it was removed from operation of the statute of frauds by partial per-

formance, rendered judgment for plaintiff. 15 O.S.1951 § 136. Thereafter, defendant perfected the present appeal. Our continued reference to the parties will be by their trial court designations.

As her first argument for the judgment's reversal, defendant argues that the evidence does not possess the necessary attributes for sustaining a judgment for specific performance of an oral contract to convey real estate. She says the evidence to support such a judgment must be clear and conclusive, and leave no doubt that a contract was entered into and as to its specific terms. Plaintiff's argument is to the effect that, conceding this to be the rule, the evidence was sufficient, under it, to support the judgment. He recognizes that, in some respects, the testimony elicited on behalf of the defendant is in conflict with that adduced on his behalf, but he argues that this in nowise indicates the insufficiency, under the rule, of the evidence, as a whole.

With plaintiff's argument we agree. In some cases, the circumstances, or the parties' actions, speak more emphatically, clearly and conclusively than their words, or testimony (See Thompson v. Giddings, Okl., 276 P.2d 229, 237); and, after carefully examining the record, we are convinced that this is one of those cases. Here, the testimony of the defendant, and that of her sister, who was her only other witness, corroborated other evidence in establishing beyond question that both women clearly understood, before they agreed to the hereinbefore described settlement with the School Land Commission, and executed the special deed to it, that plaintiff wanted the entire interests of the other heirs in the homestead farm, as his price for agreeing to the settlement and signing said special deed. The evidence further shows, without contradiction, that plaintiff remained adamant in demanding that the other heirs agree to his having that farm, as a condition of said settlement, and that he realized, because of the Commission's requirement that the Special Deed be signed by *all* of the heirs, before it would dismiss Cause No. 22,430 (and thus obviate the risk of a possible large judgment against the estate with consequent loss to each heir) that he was in a strategic position to press this demand (as Mrs. Reser quoted him as saying: " ' *  *  * we are all in it together and we are going to stay in it and see it through.' And he said if we didn't "whenever I get ready to pull the cork why I'll pull the cork and we'll all sink.' "). Under the circumstances, we think there can be no question but that the defendant and her sister knew, or should have known, before signing the special deed, that when they did so, that act would lead plaintiff and his brother to believe, or be unhesitatingly interpreted by them, as consent to, or acquiescence in, plaintiff's demand. Under the circumstances their said act could not have been otherwise interpreted. In this view of the matter, it is not necessary, nor important, to dwell upon the less significant differences between the testimony for plaintiff and that for defendant as to the precise words, or expressions of the parties at the two November gatherings. Nor is it necessary to attempt to interpret the "Ha, ha" which defendant's evidence represented she emitted as her last answer to plaintiff's demand before the special deed signing. She could not effectively withhold consent with her mouth and, then a few minutes later, give it with her hand, or handwriting. If she had mental reservations about signing the special deed, or secret intentions of never complying with plaintiff's demand for conveyance of her full one-fourth interest in the homestead, she, in all fairness both to herself and to her brother, should not have signed the special deed. She cannot, in good conscience, deny the legal effect of this act, on the ground that her's and the other parties' minds had not completely met. If the law countenanced such conduct, every contract would be vulnerable, and a potential instrument of fraud.

In examining the record, we have, pursuant to defendant's request, considered the comments of the trial judge that she cites,

as well as all others made during the trial, that might be interpreted as reflecting on the sufficiency of the evidence to establish plaintiff's cause of action. As, in our view of the case, the importance of the parties' expressions is minimized in comparison with their acts of executing the School Land deed, meagerness, or conflict in, the testimony with reference to expressed (as distinguished from tacit) agreement, does not indicate unsoundness in the judge's final appraisal of the evidence, or his judgment based thereon.

Nor are we impressed by defendant's extended argument attempting to show that the justifiable loss, which plaintiff suffered by the School Land Settlement, constitutes an insufficient consideration for the claimed agreement by the other heirs to deed him their entire interests in the homestead, and that the benefits he received by said settlement were out of all proportion to the modest loss he suffered thereby. The evidence, as a whole, tends to show that, either out of deference to their father's wishes, or because of the pressure of circumstances, defendant, Eleanor, and Elliott all recognized a need, obligation, or one or more reasons, for recompensing plaintiff for the School Land loss, out of their shares in the homestead. If the parties agreed upon their entire one-fourth interests, as such compensation to plaintiff—and we have determined that the trial court was warranted in so finding—then whether these interests were more, or loss, valuable than plaintiff's property interests in the School Land—if the other heirs acceded to giving plaintiff more than he was losing, in order to get him to change his previous recalcitrant course and join them in accepting the School Land Commission's proposal of settlement, they were free to do so; and, under the circumstances of this case, we do not regard the relative fairness and/or comparative individual benefits from said settlement as being of controlling probative value.

Defendant's argument under her Proposition No. 2 seems to assume that the par-

tial performance which the trial court held had removed the subject contract from operation of the Statute of Frauds, consisted solely of plaintiff's going into possession of, and making improvements upon, the homestead farm. She seeks to show that, as plaintiff and his brother Elliott were farming this land, and all four of the heirs were cotenants in its ownership, before the settlement, his possession and acts of improving the farm were not referable to the contract; and, under applicable rules, were insufficient to remove it from the statute's operation. Plaintiff points out that, on the basis of the evidence, the contract was not dependent on plaintiff's possession and improvement of the farm to escape the statute's operation, but that the signing of the School Land Special Deed, the relinquishment and extinction of plaintiff's claimed rights in the school land, by the agreed settlement, and dismissal, of Cause No. 22,430, and the subsequent distribution which occurred in the Knapp Estate administration proceedings, all constituted partial performance of the contract. We agree with plaintiff's position generally. We think that under the undisputed evidence in this case there can be no dissent to the view that performance of the oral contract in question has been so nearly completed, and plaintiff has so far altered his position in reliance on said contract, that restoration to his former position is now impossible; and it would be perpetrating a fraud upon him to now allow defendant to repudiate the contract and take shelter under the Statute of Frauds. In this connection, see Stinchcomb v. Stinchcomb, 207 Okl. 59, 246 P.2d 727, and King v. Gants, 77 Okl. 105, 186 P. 960, and the authorities therein cited. We, therefore, conclude that the trial court's judgment was not erroneous as to this phase of the case.

Nor does the evidence of the Knapp Heirs' contacting Oklahoma City Attorney Garnett, months after the School Land Commission's Special Deed was executed, induce the conclusion that they had never *previously* reached complete agreement as

to what interests in the homestead plaintiff was to have, for joining in that deed. We think the evidence sufficient to support the trial court's apparent conclusion that the meeting with Garnett was merely an effort at compromise occasioned by the defendant's refusal to comply with the agreement previously entered into, and already partially executed.

On the basis of the foregoing views and our opinion that defendant's arguments present no valid ground for reversing the trial court's judgment, said judgment is hereby affirmed.

DAVISON, C. J., WILLIAMS, V. C. J., and WELCH, JOHNSON, JACKSON, IRWIN and BERRY, JJ., concur.